1  Michael J. LaVelle – State Bar No. 002296
2  Matthew K. LaVelle – State Bar No. 018828
   **LaVelle & LaVelle, PLC**
3  2415 East Camelback Road, Suite 700
   Phoenix, AZ 85016
4  mjl@LaVelle-LaVelle.com
5  matt@LaVelle-LaVelle.com
   Telephone: (602) 279-2100
6  Facsimile: (602) 279-2114
   *Attorneys for Plaintiff*

7

8                    **UNITED STATES DISTRICT COURT**

9                        **DISTRICT OF ARIZONA**

10

11  Greenwich Investment Management, Inc., a
    Connecticut corporation                         No.
12
                    Plaintiff,
13  v.                                               **COMPLAINT**

14  Aegis Capital Corp., a New York
15  corporation; and Municipal
    Capital Markets Group, Inc., a Texas
16  corporation;

17                    Defendants.

18

19      Plaintiff, Greenwich Investment Management, Inc. ("Plaintiff"), by its attorneys,

20  LaVelle & LaVelle, PLC, states the following for its Complaint against Defendant Aegis

21  Capital Corp. ("Aegis") and Defendant Municipal Capital Markets Group, Inc.

22  ("MCMG" and collectively with Aegis, the "Underwriters").

23

24

25

26

27

28

                                   1

## SUMMARY OF COMPLAINT

1. This action arises out of the Underwriters' fraudulent offering and sale to Plaintiff, and Plaintiff's purchase from the Underwriters, of $16,920,000 in IDA Tax Exempt Revenue Bonds (Harvest Gold Silica Project – Congress, Arizona) Series 2019A ("Series 2019A Bonds"), and $5,120,000 in IDA Revenue Bonds (Harvest Gold Silica Project – Congress, Arizona) Series 2019B ("Series 2019B Bonds" together the "Bonds").

2. The Bonds were issued by the Arizona Industrial Authority ("IDA") in July 2019.

3. The Underwriters offered and sold the Bonds to Plaintiff by means of, and without limitation: (a) a Preliminary Official Statement dated April 26, 2019 (the "POS"); and (b) an Official Statement dated July 12, 2019 (the "OS" and, collectively with the POS, the "Offering Documents"). The Offering Documents were drafted and signed off on by the Underwriters before sending them to the Plaintiff.

4. The proceeds from the offering and sale of the Bonds were allegedly supposed to be used by the borrower, Harvest Gold Silica, Inc. ("HGS" or the "Borrower") to: (a) finance and refinance the costs to purchase buildings, production and support equipment to operate and equip facilities to remediate mine solid waste into silica-based products on leased real property in Congress, Arizona (the "Facilities"); (b) fund any required reserves related to the Series 2019A Bonds, (c) to fund capitalized interest on the Bonds, and (d) finance costs of issuing the Bonds. The Facilities would be owned by HGS and operated by Vast Mountain Development, Inc. ("VMD") on land leased by HGS from VMD.

5. The Bonds were to be repaid by, and were secured by, the revenues generated from the operation of the Facilities (the "Project"), which would come from

2

customer payments received by the Borrower from the sale of products produced by the Facilities (the "Revenues").

6.     The Underwriters, through the Offering Documents, provided the Plaintiff with facts upon which to make an investment decision concerning the Bonds and, in accordance with their obligations discussed in detail below, were obligated to conduct adequate due diligence and provide the Plaintiff with full, fair and accurate disclosure of all material facts concerning the Bonds.

7.     As set forth in detail below, the Underwriters offered and sold the Bonds to the Plaintiff by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements contained in the Offering Documents, in the light of the circumstances under which they were made, not misleading. Among other things, the Offering Documents misrepresented and/or failed to disclose:

    a. The interrelated relationship, including overlapping management and ownership, between HGS and VMD, and the history and status of the Project at the times the Bonds were issued;

    b. The fact HGS and VMD failed to obtain permits required for the Project to operate, meaning the Project could not (and ultimately did not) generate the Revenues necessary to repay the Bonds;

    c. The nature of the product manufactured at the Facilities, which misrepresentations served, in part, as the basis for the falsely inflated Revenues;

    d. The historical financial performance of the Project, which undermined and contradicted the financial projections concerning the anticipated Revenues in the Offering Documents; and

    e. Prior securities violations by VMD and its principals (who were the same principals as those of Borrower) in connection with Arizona mining operations (including the exact Project at issue here).

8.     The Underwriters knew, or in the exercise of carrying out their obligations as underwriters could have, and should have known, the true facts concerning the Bonds set forth above, and failed to disclose such facts in accordance with their duties.

9.     The Plaintiff did not know about these material facts at the time it purchased the Bonds. If the Plaintiff had known the truth, it would not have purchased the Bonds.

10.     The Underwriters' conduct violated the Arizona, Texas and Connecticut state securities acts (the "State Acts").

11.     The Plaintiff is seeking the rescission of Plaintiff's purchase of the Bonds under the State Acts or, in the alternative, damages available under the State Acts and the Plaintiff's common law claims.

## PARTIES, JURISDICTION AND VENUE

12.     The Plaintiff is a registered investment advisor under the Investment Advisors Act of 1940, as amended, and is incorporated, and maintains its principal place of business, in Stamford, Connecticut. Plaintiff purchased the Bonds for itself and its clients. The Plaintiff is the "Bondholder Representative" within the meaning of the Bond Documents (as defined below), and the registered investment advisor for its Bondholder clients pursuant to various investment advisory agreements. In those respective capacities, the Plaintiff is authorized to bring this action on behalf of itself and its Bondholder clients.

13.     Aegis is a New York corporation with its principal place of business in New York City, New York. Aegis is a registered securities broker, dealer and underwriter. Aegis, along with MCMG, served as an underwriter, offeror and seller of the Bonds, was one of the principal authors of the Offering Documents and other Bond Documents (defined below), made false and misleading representations of material fact in the Offering Documents and failed to disclose numerous other material facts.

14.     MCMG is a Texas corporation with its principal place of business in Dallas, Texas. MCMG is a registered securities broker, dealer and underwriter. MCMG, along with Aegis, served as an underwriter, offeror and seller of the Bonds, was one of the

4

principal authors of the Offering Documents and other Bond Documents (defined below), made false and misleading representations of material fact in the Offering Documents and failed to disclose numerous other material facts.

15.　　This Court has federal jurisdiction pursuant to 28 U.S. Code §1332 because, as set forth above, the Parties are citizens of different states, and the amount in controversy exceeds $75,000.

16.　　Venue of this action lies in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred, and the property at issue is located, in this District.

## FACTUAL ALLEGATIONS

### History of the Project

17.　　The Bonds were offered and sold (through the Offering Documents) based upon the fundamental premise that the Project was a near start-up venture that would mine, manufacture and sell a scientifically validated, unique and highly valuable silica-based product that would, in turn, generate the substantial Revenues to repay the bondholders.

18.　　Unbeknownst to the Plaintiff, the fundamental premise was false. The Project had been operating for at least three years prior to the Bond offering, run by the same entities and individuals—namely, John D. Owen ("Owen") and his entities HGS and VMD—and funded by a series of private offerings. The Project (as funded by the prior offerings) had been an abject failure - it failed to generate any revenues to repay prior investors. In fact, the Project failed to obtain the necessary permits required by the State of Arizona in order to even operate.

19.　　When the prior operations and investments failed (again, all of which were not disclosed to the Plaintiff), the same players, with the assistance of the Underwriters, sought additional funds through the issuance of the Bonds. Likely aware there would be no market for a $22mm bond issuance to fund a failed project, the Offering Documents repackaged the Project as a start-up venture that would mine, manufacture and sell

unique, organic grade silica to an exploding market. In so doing, the Offering Documents failed to disclose (among other things): the Project's historical financial failures (which undermined and contradicted all projected Revenues necessary to repay the Bonds); the fact the Project did not have the required permit (meaning it could not even operate much less generate any of the projected Revenues necessary to repay the Bonds); and the history of securities fraud committed by the principals involved in the Bond issuance. The Offering Documents also misrepresented the quality of the silica and the relationships among the deal participants, which were rife with conflicts of interest.

## The Bond Offering

### The Bonds and Bond Documents

20.    As stated above, the Bonds were issued by the IDA in July 2019. The IDA is a political subdivision of the State of Arizona, and acted as a conduit issuer, meaning it did not pledge assets to secure payment of the Bonds, and otherwise committed no source of funds for payment of the Bonds.

21.    The Bonds were offered and sold by the Underwriters pursuant to the Offering Documents.

22.    As set forth in the Offering Documents (and as stated above), the Bond proceeds were allegedly supposed to be used to pay all, or a portion of, the costs (a) to finance and/or refinance, the Facilities; (b) to fund any required reserves related to the Series 2019A Bonds, (c) to fund capitalized interest on the Bonds, and (d) to finance the costs to issue the Bonds.

23.    Of the $22 million in Bond proceeds, nearly $14.5 million was allocated to HGS's purchase of the Facilities from VMD.

24.    The Bonds were to be repaid by, and were secured by, the Revenues which, as stated above, would come from the Project's manufacture and sale of a purportedly unique, organic and highly-valuable silica based product.

25.    The use, distribution and repayment of the Bond proceeds are governed by a series of legal documents including: 1) the Loan Agreement entered into by and between

HGS and IDA dated as of July 1, 2019 (the "Loan Agreement"), pursuant to which the Bond proceeds were loaned to HGS; and, 2) the Trust Indenture entered into between IDA, as the issuer, and UMB Bank, N.A., as the Trustee for the Bonds (the "Trustee"), dated July 1, 2019 (the "Indenture").

26.    The Offering Documents, Loan Agreement and Indenture are collectively referred to herein as the "Bond Documents."

27.    As the Underwriters, Aegis and MCMG were, upon information and belief, the principal authors of each of the Bond Documents and ensured their names were prominently displayed on the Offering Documents. In addition, as confirmed in an opinion letter from Underwriters' counsel (Rodey, Dickason, Sloan, Akin & Robb, P.A.), Aegis and MCMG were involved in an "investigation" of the Offering Documents, and both Aegis and MCMG participated in the "preparation of the Official Statement."

***The Underwriters offered and sold the Bonds to the Plaintiff in Connecticut.***

28.    In or around May 2019, the Plaintiff, while located in Connecticut, was contacted by Aegis and MCMG, in an attempt to sell Plaintiff the Bonds.

29.    For example, on or around May 28, 2019, Aegis emailed the POS, an investor presentation and various other documents pertaining to the Bonds to the Plaintiff in Connecticut.

30.    From May 2019 through the sale of the Bonds, the Underwriters provided the Plaintiff with additional documents and information concerning the Bonds, and responded to a number of requests for information from the Plaintiff regarding the Bonds, including the structure of the Bonds and the participants involved.

31.    Upon information and belief, Aegis and MCMG sold the Bonds to the Plaintiff from their headquarters in New York and Texas, respectively.

32.    The Plaintiff, located in Connecticut, purchased all of the Bonds, some for its own account and some for its clients. The Plaintiff read and relied upon the Bond Documents, including all representations therein, in connection with its decision to purchase the Bonds.

7

*Aegis and MCMG's Obligations as Underwriter.*

33.     Aegis and MCMG, as the Underwriters, offerors and sellers of the Bonds, were responsible for the accuracy and completeness of the representations made to potential purchasers of the Bonds in the Bond Documents. To that end, the Underwriters were obligated to: exercise reasonable care and competence in obtaining information for, and communicating information in, the Bond Documents; make full, fair and accurate disclosure in the Bond Documents of all material facts potential purchasers of the Bonds needed to make fully informed investment decisions; and conduct adequate due diligence to ensure the Bond Documents did not contain any misrepresentations or omissions of material fact. Further, by making any representations in the Bond Documents, the Underwriters were obligated to make full, fair and accurate disclosure of all material facts.

34.     As the Underwriters, offerors and sellers of the Bonds, Aegis and MCMG were responsible for the accuracy and completeness of the representations made to bond purchasers (including the Plaintiff) in the Bond Documents, including the Offering Documents.

35.     The Underwriters had a duty to exercise reasonable care and competence in obtaining information for, and communicating information in, the Offering Documents. Specifically, and without limitation, Aegis and MCMG's role as the Underwriters of the Bonds imposed upon Aegis and MCMG the following obligations and standards:

    a.  Underwriters assume toward investors the high standards of honesty, care and competence commonly required of fiduciaries.

    b.  An underwriter has a duty to conduct an investigation that provides a reasonable basis for a belief that the key representations in the statements made to investors are truthful and complete.

c.  When an underwriter associates itself with a proposed offering, it is representing that it has made an investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus. The underwriter who does not make a reasonable investigation is derelict in its responsibilities to deal fairly with the investing public.

d.  When an underwriter puts its name on the cover of a prospectus it indicates the issue was investigated, the underwriter is satisfied with it and has, in effect, endorsed it.

e.  To make the underwriter's participation in the issuance of securities (such as the Bonds) of any value to the investors, the underwriter must make some reasonable attempt to verify the data submitted to them. When the underwriter does not speak out, the investor may reasonably assume there are no undisclosed material deficiencies. No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter.

f.  More effort on the part of underwriters is required than the mere accurate reporting of data presented to them by the borrower. It makes no difference that the underwriter may have believed at the time of issuance that the borrower was truthful and reliable. An underwriter cannot rely solely on the borrower's management because a reasonable person in the management of their own property would not rely on them.

g.  An underwriter, like other participants in the disclosure process, is deemed to have made false or misleading statements and to have a duty to disclose if it places its imprimatur on the disclosure document.  Imprimatur is a statement of approval of that which is published. Here, the Underwriters' names appear prominently on the cover of the Offering Documents, and,

upon information and belief, the Underwriters (either directly or through their counsel) were the primary drafters of the Offering Documents. As such, the Underwriters placed their "imprimatur" on the Offering Documents.

h. The duty to investigate is placed on the underwriter because its role is crucial to the integrity of the market and the confidence of the investing public. An underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the public who must rely on published information. The relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security. Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security. Therefore, since the underwriter is unquestionably aware of the public's reliance, the fact that the underwriter has underwritten the issue is an implied representation that professional standards were met in the underwriter's investigation of the issuer.

36. Underwriters serve a critical role as the gatekeepers to ensure the integrity of the bond market. That role is well understood by investors, particularly institutional investors such as the Plaintiff. Before using the Offering Documents to offer and sell the Bonds to the Plaintiff, the Underwriters had an obligation to conduct an investigation sufficient to assure themselves that the Offering Documents were free of any material misstatements, did not omit information necessary to make the statements contained therein not false or misleading, and that any projections in the Offering Documents were reasonable and supported by the existing facts upon which they were based at the time the projections were made and communicated to potential investors, such as the Plaintiff, in the Offering Documents.

37.     These obligations are consistent with the requirements of the State Acts, which prohibit the Underwriters from offering or selling the Bonds to the Plaintiff on the basis of false or misleading statements or omissions of material fact. Projections can be false or misleading statements if they are not reasonably believed when made or if there are known and undisclosed facts which would cast doubt upon the accuracy of the projection(s).

38.     By virtue of their role as the Underwriters of the Bonds, their express representation of compliance with their obligations under federal securities laws, and their undertaking to offer and sell the Bonds to the Plaintiff, the Underwriters undertook and assumed an obligation to exercise reasonable care in obtaining and communicating to the Plaintiff the information contained within the Offering Documents, to disclose to the Plaintiff all material facts within the Underwriters' knowledge, and to take reasonable steps to ensure that the Offering Documents were devoid of any misrepresentation or omission of material fact (including that all projections set forth in the Offering Documents were honestly believed to be reasonable when made and all facts that might undermine such projections were disclosed).

39.     Independent of their obligations as the underwriters of the Bonds, Aegis and MCMG also have disclosure obligations that arise from their undertaking to provide the Plaintiff with information concerning the Bonds (detailed below). Anyone who undertakes to make any disclosure to a purchaser of securities owes a duty to make full, fair and accurate disclosure of all material facts. Since a half-truth is, by definition, a misrepresentation, once Aegis and MCMG undertook to provide the Plaintiff with any information, they had a duty to speak the full truth.

40.     The Underwriters clearly recognized their obligations as underwriters, telling investors in the Offering Documents that the Underwriters have reviewed the information in this Official Statement in accordance, with and as part of, their responsibilities under the federal securities laws as applied to the facts and circumstances of this transaction.

41.    The Offering Documents disclosed that Aegis and MCMG collectively received $1,066,363 from the Bond proceeds as compensation for their role as Underwriters.

**The Offering Documents contain multiple misrepresentations and omissions of material fact.**

*Misrepresentations and omissions regarding the relationship between VMD and HGS, HGS's background and expertise, and the status of the Project.*

42.    Since at least 2016—three years prior to the Bond issuance—the Project had been operating and managed by the same group of principals (namely, Owen, HGS and VMD).  VMD and HGS had been selling interests in the Project since 2016 based on the premise that the Project was already operating on a commercial scale and projected to generate substantial revenues in the immediate future—i.e., approximately three years before the Bond offering.

43.    For example:

    a. VMD began soliciting investments in the Project in 2016 and 2017 based on representations that the Project would generate substantial revenues from the extraction, manufacture and sale of valuable silica products from the Project. VMD represented the investment would result in a 6 to 1 return of capital over the four year term of the Project. The 2016 offering represented the Project would be up and running capable of producing silica on a commercial scale and generating corresponding profits within a few months. Notably, the 2016 offering represented the cost to purchase or build the Facilities (the same Facilities at issue in the Bond issuance) would only cost $645,000.

    b. In November 2017, Owen and others formed VMD's affiliate company, HGS. As alleged below, HGS and VMD were effectively owned and operated by the same individuals.

c. None of the projected sales in connection with the 2016 and 2017 offering materialized. As a result, in 2018, VMD, with the help of HGS, sought new investments in the Project based on the same underlying premise: the Project would generate substantial revenues (this time resulting in 9.8 to 1 return for investors) from the extraction, manufacture and sale of silica. This time, VMD would be the operator and HGS would rely on its "expertise" to market and sell the product. Like the 2016 and 2017 offering, the 2018 offering advised investors that the Project was already up and running on a commercial scale with substantial sales already secured. To that end, VMD and HGS represented they had been successfully marketing and selling the silica for well over a year, resulting in substantial sales around the country.

44. Contrary to all of the representations to investors described above, the 2016-2018 offerings in connection with the Project were a failure. The promised orders and sales did not exist, and never had. The Project did not produce any net revenues, much less the substantial revenue VMD and HGS had projected when selling interests in the Project. In fact, the Project failed to obtain an aquifer protection permit (the "Permit") from the Arizona Department of Environmental Quality ("ADEQ"), which it was required to obtain in order for the Project to operate, much less generate revenue.

45. As the earlier investors in the Project began to realize that the Project was a failure, it was clear to VMD and HGS that they could not return to that financing source again. Accordingly, they decided to attract new investors to put their money into the failed Project by offering yet another solicitation: the $22 million Bond offering at issue in this action.

46. Despite the Project's long history of being an abject failure, the Offering Documents did not disclose any of the history as outlined above.

47. In fact, the Offering Documents misrepresented the Project as being in a near start-up phase. Specifically, the Offering Documents stated the Project had been

"operated . . . only on a pilot basis," and "there can be no assurance that the process can be brought to the commercial scale projected by the Borrower." POS, p. 3. Elsewhere, the POS stated that VMD "had not begun material production capable of sustaining a commercial silica business." *Id*. at p. 19.

48.    By conveying the Project as a start-up, potential investors had no reason to know the history of the Project, including: the past private investments in the Project, the operating history and track record of the Project, and the projections that had been previously made and offered to investors regarding the Project (which projections, as discussed above, failed to materialize).

49.    In furtherance of the effort to portray the Project as a "start up", the Offering Documents failed to accurately convey the interrelated nature of the relationship between HGS and VMD.

50.    Upon information and belief, VMD and HGS were, at all times relevant to this Complaint, effectively managed and owned by the same individuals. For example:

      a. Owens was a director and CEO of VMD and held a substantial equity interest in VMD. At the same time, Owens was a director and CEO of HGS and, along with his children, collectively owned more than 50% of HGS's stock.

      b. Robert Palmer was both a director and president of VMD and a director of HGS.

      c. Don Brown was a director and vice president of VMD and a director of HGS.

      d. James Somma was both an executive officer of VMD and a director and executive officer of HGS.

      e. Rachel Misti was a director and executive officer of both VMD and HGS.

      f. Kevin Jones was the president and CEO of Cardinal Resources, a director of HGS and provided consulting services to both VMD and HGS.

51.    Despite the clear overlap in management and ownership between VMD and HGS, the Offering Documents failed to disclose such overlap and conflicts of interest. For example:

    a. In the "Relationships Among Parties" section of the POS, the *only* "relationship" disclosed was the fact that Jones was a director of HGS and also an officer of Cardinal Resources, which had provided "environmental and permitting services" to HGS.

    b. The "Relationship Among Parties" section did not disclose the substantial overlap in management and ownership between VMD and HGS as outlined in detail above.

    c. A separate section of the POS describing VMD stated that Owen was a director and CEO of VMD, and that he "was, but is no longer," the CEO, majority shareholder, and a director of HGS. This statement furthered the false narrative of complete separation between Owen and HGS, and, by extension, the absence of any relationship among and between VMD and HGS. As alleged in detail above, during the relevant time period described in this Complaint, Owen was both a director and CEO of HGS, and he and his children collectively owned more than fifty percent of its stock. If he was "no longer" in those positions at the specific time of the OS, then he must have resigned, briefly, for the purpose of hiding his past relationship with HGS. Later, Owen represented that he was (again) CEO of HGS.

52.    Continuing the pretense of separation between VMD and HGS, the Offering Documents described HGS as being "created for the purpose of engaging in the processing of solid waste from mining into a useful high-grade organic, certified agricultural soil additive silica product and the marketing of that product." POS, p. 18, ¶1. In other words, the story told to prior investors (which was not disclosed to the Plaintiff), that VMD had been formed to process the tailings and extract the silica, and that HGS was merely an affiliate company taking over marketing of the product, was

1   replaced with a new story that HGS had been formed as a business to process the tailings

2   and extract the silica in the first instance.

3       53.    The Offering Documents went on to portray HGS as the only entity capable

4   of making the Project profitable. According to the POS, VMD "does not have the

5   expertise to package and profitably market the silica." POS, p. 20. This, in turn, was used

6   to create the misleading impression that HGS needed to purchase the Project Facilities

7   from VMD, as if HGS were seeking to acquire an asset from an unrelated business in

8   order to carry out its own, separate business based on its own "expertise."

9       54.    This narrative is directly contradicted by the 2016 and 2017 offering

10  described above (none of which was disclosed to Plaintiff), which represented that VMD

11  could, in fact, generate sales and profits on its own.

12      55.    Further, HGS had long represented that it was already using its claimed

13  "expertise," successfully, in marketing and selling silica on a commercial scale. Thus, the

14  idea that HGS needed to sell Bonds in order to "profitably market the silica" contradicted

15  what both VMD and HGS had been repeatedly telling their prior investors over the past

16  years (none of which was disclosed to Plaintiff prior to purchasing the Bonds).

17      56.    Likewise false and misleading was the OS's reference to HGS's supposed

18  expertise in packaging, and the need for HGS to raise substantial funds for that purpose.

19  Again, the prior offerings represented that VMD could generate substantial sales and

20  profits, on a commercial scale, beginning in just five months, with the facilities it was

21  going to construct or acquire.

22      57.    HGS in fact had no marketing expertise, much less expertise needed to

23  "profitably market" the silica, and likewise had no "packaging" expertise. To the extent

24  that HGS had any experience in those areas, its track record was an absolute failure,

25  contrary to everything it had been telling investors.

26      58.    These misrepresentations, coupled with the material omissions described

27  above, created the illusion that HGS had the special, unique background and expertise to

28  take over a "near startup" business – i.e., the Project – and bring it to great success. That

16

1    illusion was then used in the Offering Documents to justify HGS's purported need to use
2    over $14 million from the Bond proceeds and effectively pocket the money by
3    transferring it to its affiliate VMD in exchange for the Facilities. Upon information and
4    belief, there was no legitimate need or justification for HGS to purchase the Facilities
5    from VMD, much less for $14 million, particularly in light of the fact that the
6    information provided to the prior investors estimated the cost of purchasing or building
7    the facilities necessary to construct a silica processing plant as less than $650,000.

8        59.    All of the above facts regarding the history of the Project and true nature of
9    the interrelated relationship between VMD and HGS were material to potential
10    purchasers of the Bonds. For example:

11        a. The fact the Project had been operating as an abject failure for years (in
12            direct contradiction to the Offering Documents' representation that the
13            Project was in start-up phase) and during that time failed to generate
14            anywhere near the substantial revenues projected by VMD and HGS, would
15            be critical to potential Bond purchasers (including Plaintiff) as they
16            analyzed the financial prospects of the Project, including its projected
17            Revenues which, again, were the sole basis for repayment of the Bonds;
18            and

19        b. The fact that a substantial portion of the Bond proceeds (over $14 million)
20            would be used by HGS to pay VMD, which was effectively owned and
21            controlled by the same principals who owned and controlled HGS, for the
22            Facilities would be material to potential investors, particularly in light of
23            the fact that the offering documents issued in connection with the prior
24            capital raise stated the Facilities would cost no more than $650,000.

25        60.    The Underwriters knew, or through the exercise of their due diligence
26    obligations should have known, that the representations regarding the relationship
27    between VMD and HGS, and the history and status of the Project, were false and
28    misleading. At minimum, the Underwriters knew, or should have known, that they lacked

1   a reasonable basis for belief in the accuracy and completeness of these representations in

2   the Offering Documents.

3        61.    Despite knowing about the true nature of the relationship between HGS and

4   VMD and the history and status of the Project (or, at minimum, as a result of their failure

5   to conduct basic due diligence required of underwriters), the Underwriters failed to

6   disclose these material facts in an accurate and complete manner to Plaintiff. Further, as

7   experienced underwriters, the Underwriters knew (or should have known) that these facts

8   would be considered important and material by potential purchasers of the Bonds.

9   ***Misrepresentations and omissions about the Permit.***

10       62.    As stated above, the Project required the Permit in order to even operate,

11  much less generate the substantial Revenues projected in the Offering Documents.

12       63.    HGS and VMD were well aware—and the Underwriters, in their exercise of

13  due diligence certainly should have known—that the Project required the Permit. For

14  example:

15           a. In November 2017, ADEQ sent VMD and HGS an email containing a

16              Consent Order stating ADEQ had determined that VMD needed to apply to

17              transfer to VMD the Permit issued to the prior owner of the property and,

18              within 60 days, to submit a site assessment evaluating the "tailings

19              impoundment and catchment basin."

20           b. Despite the November 2017 email from ADEQ, VMD did not submit the

21              site assessment, did not apply to transfer the old Permit, and did not apply

22              for a new Permit.

23           c. As a result, in May, 2018, ADEQ issued a Notice of Violation to VMD. The

24              Notice stated the Congress Mine was required to secure the Permit, and

25              ordered VMD to submit an application for the Permit or an application to

26              transfer the existing Permit within 21 calendar days, along with the required

27              closure plan. ADEQ warned that "[t]he time frames within this Notice for

28              achieving and documenting compliance are firm limits," and failure to meet

18

them would result in an administrative compliance order or a civil action that could involve "substantial civil penalties."

d. Again, VMD did nothing. Accordingly, in September 2018, ADEQ issued a Compliance Order to VMD (the "Compliance Order") warning that failure to comply with ADEQ's directives would result in VMD's potential liability for civil penalties, including injunctive relief and a civil penalty of not more than $25,000 per day per violation.

e. The ADEQ Compliance Order became final and judicially enforceable on January 12, 2019, and ADEQ ultimately sued VMD for failure to obtain the required Permit, sought a preliminary injunction barring any operations from continuing until the Permit had been issued, and sought civil penalties of $25,000 per day from January 12, 2019 forward, until the Permit was issued.

64.    Despite knowing the Project required the Permit, VMD and HGS failed to procure it. The Offering Documents did not disclose that the Project required the Permit to operate, the fact the Project had failed to procure the Permit, or the long history of the interaction between VMD/HGS and ADEQ regarding the Permit outlined above.

65.    In fact, the Offering Documents contained a number of misrepresentations indicating the Project had acquired all necessary permits. For example:

a. An Independent Engineer's Report authored by E3 Consulting (the "E3 Report") attached to the Offering Documents states "[VMD] has obtained all the permits necessary to operate the process plant and excavate the tailings piles." The E3 Report went on to state "[t]he operations of the process plant are categorically exempt from the Aquifer Protection Permit ("APP") administered by the Arizona Department of Environmental Quality ("ADEQ")." The Report then acknowledged what it called "[t]he pre-existing historic [Permit]," but assured the Permit was only needed for "the Goldfield Tailings," as opposed to the silica operations, and that in any

event, "Vast Mountain has negotiated with ADEQ to transfer the historic [Permit] to Vast Mountain."

    b. The form Loan Agreement between IDA and HGS attached to the Offering Documents represented that "[t]o the best of the Borrower's knowledge, the use of the Project, as it is proposed to be operated by the Operator [VMD], will comply in all respects material to the ability of the Borrower to pay and perform its obligations under the Loan Agreement with all presently applicable . . . laws, regulations and ordinances of the federal government and the State and the respective agencies thereof."

    c. The Loan Agreement also represented there were "no pending or threatened suits which would have a material adverse effect on [HGS's] financial condition, operations, or ability to perform its obligations under the Borrower Documents."

    d. The form Asset Purchase Agreement between HGS and VMD (under which HGS would purchase the Facilities from VMD) attached to the Offering Documents represented "[t]he Seller [VMD] has all licenses, permits, approvals, authorizations, registrations, certificates, variances or similar rights issued by any governmental authority."

66. The misrepresentations and omissions regarding the Permit were not limited to the Offering Documents. For example, in email correspondence between the Plaintiff and Aegis in early June 2019 prior to the Bond issuance, the Plaintiff asked Aegis if the Project had obtained all necessary permits. In response, Aegis confirmed no further permits were required.

67. These representations were false. As early as 2017 ADEQ made it clear that the Project required the Permit in order to operate. Without the Permit, the Project could not operate, meaning it could not (and ultimately did not) generate any revenues, much less the substantial revenues projected in the Offering Documents. Without revenues, the Bonds could not be (and ultimately were not) repaid.

68. All of the above facts regarding the Permit were material to potential purchasers of the Bonds since the Bonds were to be repaid by (and were secured by) the Revenues generated by the Project. Without the Permit, the Project could not operate, making it impossible to generate the Revenues to repay the Bondholders. In short, the fact that the Project required the Permit goes to the heart of the deal: without the Permit, the Bonds could not (and ultimately were not) repaid. Any fact adversely impacting a borrower's ability to repay bonds is material to an investor's decision to purchase bonds.

69. The Underwriters knew, or through the exercise of their due diligence obligations should have known, that the representations regarding the Permit were false and misleading. At minimum, the Underwriters knew, or should have known, that they lacked a reasonable basis for belief in the accuracy and completeness of these representations in the Offering Documents.

70. Despite knowing about the Permit (or, at minimum, as a result of their failure to conduct basic due diligence required of underwriters), the Underwriters failed to disclose these material facts in an accurate and complete manner to the Plaintiff. Further, as experienced underwriters, the Underwriters knew (or should have known) that these facts would be considered material by potential purchasers of the Bonds.

***Misrepresentations regarding the "unique" and "organic" nature of the product.***

71. The Offering Documents falsely represented that the Project had the ability to produce a "unique," "organic" silica, which had a market value many times that of other silica.

72. For example, the Offering Documents stated HGS was "created for the purpose of engaging in the processing of solid waste from mining" into a "high-grade organic, certified agricultural soil additive silica product and the marketing for that product." Elsewhere, the Offering Documents stated the silica product produced by HGS was "unique," because it "provides ten other nutrients that amplify plant growth while allowing the plant to express its full potential." The Offering Documents also represented that "[u]nlike other plant growth products whose nutrients must breakdown before they

1   can be absorbed by the plant," the HGS Silica and nutrients "are bio-available to the plant

2   from the very first watering."

3       73.    At least ten times, the Offering Documents repeated the notion that the HGS

4   Silica was "organic."

5       74.    Further, Aegis advanced the "organic" narrative in email correspondence to

6   the Plaintiff in early June 2019 prior to the Bond issuance.

7       75.    The "unique" and "organic" silica narrative was used to inflate the value of

8   the product manufactured at—and, by extension, the Revenues generated by—the

9   Project. To wit: the Offering Documents represented that the "organic" silica was at least

10   *ten times* more valuable than the "non-organic" variety.

11       76.    The effect of the "organic" narrative was to prop up the unreasonably

12   inflated financial projections contained in the Offering Documents, which were

13   predicated, in part, on the notion that production from the Project (and therefore the

14   Revenues available to repay the Bondholders) would be significantly increased by the

15   "organic" product.

16       77.    These representations were false. In reality, there was no additional

17   processing needed to generate the so called "organic" silica versus the "non-organic"

18   silica. Moreover, the silica was not certified as "organic." In truth, only food and food

19   additives can be labeled as "USDA certified organic," ***not*** soil amendments such as sand

20   or silica or fertilizer. Soil amendments may only be identified as usable for organic crop

21   production.

22       78.    All of the above facts regarding the "organic" narrative were material to

23   potential purchasers of the Bonds. Again, because the Bonds were to be repaid by (and

24   were secured by) the Revenues generated by the Project, any fact that undermined or

25   contradicted the Revenues would be material to an investor's decision to purchase the

26   Bonds. That is exactly what the "unique" and "organic" narrative did: the fact the

27   projected Revenues were predicated, in part, on the false premise that the product was

28

"organic"—and could therefore be sold at higher prices—meant the Project's projected Revenues could never be achieved.

79.    The Underwriters knew, or through the exercise of their due diligence obligations should have known, that the representations regarding the "unique" and "organic" product were false and misleading. At minimum, the Underwriters knew, or should have known, that they lacked a reasonable basis for belief in the accuracy and completeness of these representations in the Offering Documents.

80.    Despite knowing about these issues (or, at minimum, as a result of their failure to conduct basic due diligence required of underwriters), the Underwriters failed to disclose these material facts in an accurate and complete manner to the Plaintiff. Further, as experienced underwriters, the Underwriters knew (or should have known) that these facts would be considered important and material by potential purchasers of the Bonds.

***Misrepresentations and omissions regarding the Financial Projections for the Project.***

81.    The Project was not in the start-up phase. Instead, it had been operating for years without generating any revenue.

82.    The Underwriters failed to disclose the history of the Project, including its historical inability to generate any meaningful revenue, much less the substantial revenues projected in the prior offerings.

83.    Given the fact the Project was effectively a continuation of the same project involved in the prior offerings, the historical failure to generate revenue undermined the Project's ability to generate meaningful future revenue (which Revenues, again, were the source for repayment of, and security for, the Bonds).

84.    Instead of disclosing the failed historical financial performance of the Project, the Offering Documents conveyed the false impression that the Project was in the start-up phase (thereby avoiding discussion of the financial history) and, based on that false premise, provided the Plaintiff with financial projections that were grossly inflated,

23

1  unachievable and contradicted by the Project's long history of actual financial

2  performance (the "Financial Projections").

3    85.    The Financial Projections are located in the E3 Report, which was attached

4  and incorporated into the Offering Documents. Notably, the Financial Projections were

5  prepared by HGS, based on underlying assumptions provided by HGS. The fact the

6  Financial Projections were prepared by the Borrower—which had a vested financial

7  interest in the Bonds being issued—should have caused the Underwriters to scrutinize the

8  Financial Projections and the assumptions underlying such projections.

9    86.    The Financial Projections were based on the premise that the Project would

10  produce and sell silica on a scale sufficient to generate substantial profit in "its first full

11  year of production," defined to mean August 2019—the very next month after the Bonds

12  were issued—to July 2020.

13    87.    The Financial Projections were also based on the premise that the Project

14  was producing "unique," "organic" silica worth vastly more than ordinary silica. As

15  discussed above, the "unique" and "organic" narrative was false.

16    88.    Based on these false premises and others, the Financial Projections

17  projected: $31,004,848 in gross sales and a net profit of $6,081,583 in the first full year

18  (August 2019 through July 2020); and $53,262,125 in gross revenues and a net profit of

19  $11,783,880 in the second full year (August 2020 through July 2021).

20    89.    The Financial Projections were false at the time they were made based on,

21  among other things, the fact that:

22      a. The Project failed to generate any meaningful revenues over the previous

23        years in connection with the prior offerings outlined above (and nowhere

24        near the substantial Revenues projected in the Offering Documents) despite

25        the fact that it had been operating under the same essential business model

26        as outlined in the Offering Documents;

27      b. The Project's failure to obtain the required Permit (which, as outlined

28        above, was not disclosed to potential investors) *meant that the Project*

24

***could not even operate,*** much less generate any revenues (to say nothing of the substantial Revenues projected in the Offering Documents); and

c. Even if the Project could operate (which it could not in the absence of the Permit), the Financial Projections were predicated on the Project manufacturing and selling a highly valuable "unique" and "organic" product which, as alleged above, was false.

90. The falsity of the Financial Projections at the time they were made is borne out by the Project's actual performance. As discussed below, HGS finally (though belatedly in violation of its obligations under the Bond Documents), provided the Trustee with financial reports in January 2021, which included a "Statement of Operations" summarizing the Project's financial performance. The Statement of Operations reported the Project's financial performance as follows:

a. In HGS's first full year from July 2019 to June 2020, its gross revenues were only $384,544.67—or ***$30,620,303.33 less*** than what was projected in the Financial Projections, and, instead of a projected net profit of $6,081,583 set forth in the Financial Projections, HGS actually ***lost $4,474,268.75***;

b. In HGS's second year, from July 2020 to the February 28, 2021, HGS's gross revenues were only $45,945, or ***$53,216,180 less*** than what was projected in the Financial Projections, and instead of a projected net profit of $11,783,880 set forth in the Financial Projections, HGS actually ***lost $1,555,689.67***.

91. Since the Bonds were issued, HGS has only generated $430,489.67 in revenues through February 28, 2021 (a significant portion of which was from a sale to a related entity of HGS), compared to the $84,266,973 projected in the Financial Projections, and has suffered a loss of $6,029,958.42, compared to the $17,865,473 in net profits projected in the Financial Projections.

92.    All of the above facts underlying the Financial Projections were material to potential purchasers of the Bonds. Again, because the Bonds were to be repaid by the Revenues generated by the Project, any fact that undermined or contradicted the Project's ability to generate the Revenues—and, by extension, the Borrower's ability to repay the Bonds—is material to an investor's decision to purchase bonds.

93.    As stated above, the Underwriters were obligated to ensure the Financial Projections were reasonable and supported by existing facts at the time the Financial Projections were made and communicated to potential investors, like the Plaintiff, in the Offering Documents.  Projections can be false or misleading statements if they are not reasonably believed when made or if there are known and undisclosed facts which would cast doubt upon the accuracy of the projection(s).

94.    The Underwriters knew, or through the exercise of their due diligence obligations should have known, of the above historical facts that directly undermined the Financial Projections. At minimum, the Underwriters knew, or should have known, that they lacked a reasonable basis for belief in the accuracy and completeness of these representations in the Offering Documents. Accordingly, the Underwriters knew (or should have known) that the Financial Projections in the Offering Documents, which were predicated on false and misleading statements and omissions, were false.

95.    Despite knowing about the falsity of the Financial Projections (or, at minimum, as a result of their failure to conduct basic due diligence required of underwriters), the Underwriters failed to disclose these material facts in an accurate and complete manner to Plaintiff. Further, as experienced underwriters, the Underwriters knew (or should have known) that these facts would be considered important and material by potential purchasers of the Bonds.

***The Offering Documents failed to disclose VMD's history of securities fraud.***

96.    Owen and his company IER (predecessor to VMD) were found to have committed securities fraud in at least three instances (by three different state securities

divisions) based on misrepresentations and omissions in connection with the sale of securities involving Arizona mines (including the very Project at issue here).

97.    Specifically:

a. In September 2005, the State of Washington Securities Division filed a Statement of Charges against IER and others, charging them with violations of the Washington Securities Act, alleging IER made substantially inflated financial projections to investors regarding investments in a mine in Arizona (the "Chastain Mine"). The Washington Securities Division issued a Consent Order, under which IER and the other respondents agreed to cease and desist from offering or selling securities in Washington in violation of applicable statutes, and to pay a $5,000 penalty.

b. Also in 2005, the State of California instituted proceedings against IER and Owen based on IER's marketing and sale of securities in connection with the Chastain Mine. The California Corporations Commissioner found Owen made material misrepresentations and omissions in connection with the marketing and sale of these securities, including unsubstantiated claims about recoverable gold assets in its mines, when in reality the BLM had denied permitting of any mining at the site. Based on its findings, California issued a Desist and Refrain Order directing IER, Owen and the others to cease and desist from offering, selling or buying securities in California by means of untrue statements or omissions of material fact.

c. In July 2007, the Maryland Securities Division issued an Order to Show Cause (the "Maryland OSC") to IER and an IER employee alleging violations of the Maryland Securities Act in connection with the offer and sale of interests in the Chastain Mine. The Maryland OSC alleged IER had, among other things, made unsubstantiated financial projections in connection with the marketing and sale of these securities. The Maryland Securities Division ultimately issued its "Final Order to Cease and Desist,"

barring IER from engaging in the securities business in Maryland, and assessed a $75,000 civil penalty against IER.

98.   Along similar lines, in May 2006, the Arizona Department of Mines and Mineral Resources ("ADMMR") found IER's claims about the amount of recoverable gold in the Chastain Mine to be "very surprising and difficult to accept by comparison to historic data." In addition, ADMMR noted IER's claim that production was planned for 2006 was made "without disclosing the lack of operating permits or the years typically required to obtain them." ADMMR also said IER failed to respond to requests "to examine data that would corroborate the reserves and projections made by IER."

99.   The Offering Documents failed to disclose any information about these prior securities fraud violations.

100.   The Underwriters knew this type of background information was important to the Plaintiff as the Plaintiff asked Aegis, via email correspondence in June 2019 prior to the Bond issuance, if Aegis had done background checks on Owen and the other owners of HGS as "part of [Aegis's due diligence on the project."

101.   The fact Owen—as executive officer and director of both the Borrower (HGS) and VMD—and his entity IER (predecessor to VMD) had committed securities fraud of any ilk would be a material fact important to any investor in deciding whether to purchase the Bonds. The materiality of such securities fraud is only compounded by the fact that the violations were predicated on misrepresentations and omissions in connection with offerings involving Arizona mines, including the exact Project at issue here.

102.   The Underwriters knew, or through the exercise of their due diligence obligations should have known, of Owen's and his company's history of securities violations. At minimum, the Underwriters knew, or should have known, that they lacked a reasonable basis for belief in the accuracy and completeness of these representations in the Offering Documents regarding such violations. Accordingly, the Underwriters knew

1   (or certainly should have known) that the omissions in the Offering Documents regarding

2   the securities violations were false.

3        103.   Despite knowing about the securities violations (or, at minimum, as a result

4   of their failure to conduct basic due diligence required of underwriters), the Underwriters

5   failed to disclose these material facts in an accurate and complete manner to Plaintiff.

6   Further, as experienced underwriters, the Underwriters knew (or should have known) that

7   these facts would be considered important and material by potential purchasers of the

8   Bonds.

9   ***The Underwriters drafted and provided the Offering Documents to, and the Offering***
    ***Documents were relied upon by, Plaintiff in connection with its purchase of the Bonds,***
10  ***and Plaintiff purchased the Bonds unaware of the material misrepresentations and***
    ***omissions outlined above.***
11

12       104.   Upon information and belief, the Underwriters drafted the Offering

13  Documents, ensured their names were displayed prominently on every page and, as the

14  Underwriters, were responsible for ensuring the Offering Documents fully and fairly

15  disclosed all material facts. Further, the Underwriters prepared the Offering Documents

16  with the express purpose that they would be relied upon by potential Bond purchasers,

17  including the Plaintiff.

18       105.   By virtue of their role in the transaction, including their unique access to

19  information and obligation to make full, fair and accurate disclosure of all material facts,

20  and also by virtue of their communications with the Plaintiff, the Underwriters

21  understood that the Plaintiff was relying on them to conduct reasonable and appropriate

22  due diligence sufficient to provide reasonable assurance that the Offering Documents

23  were truthful and complete, and to provide the Plaintiff with any information that would

24  tend to undermine or call into question the statements or projections in the Offering

25  Documents.

26       106.   The Underwriters, in violation of their duties and the State Acts,

27  misrepresented and/or failed to disclose material facts as outlined above.

28

107.   The Underwriters knew or, in the exercise of reasonable care in accordance with their obligations as underwriters, should have known, that the statements in the Offering Documents contained misrepresentations or omissions of material facts regarding the above issues.

108.   The Plaintiff reviewed and reasonably relied on the Offering Documents provided to them by the Underwriters, including the accuracy of the representations therein, as well as other representations made to them by the Underwriters when making its decision to purchase the Bonds.

109.   In addition, the Plaintiff conducted a reasonable investigation before deciding to purchase the Bonds. In addition to reviewing the Offering Documents and their attachments, Plaintiff also communicated with, and posed specific questions, to Aegis and MCMG.

110.   The Plaintiff purchased the Bonds in reliance upon the information provided by the Underwriters.

111.   At the time it purchased the Bonds from the Underwriters, the Plaintiff did not know about any of the misrepresented or omitted material facts outlined above.

112.   Had the Underwriters made full and fair disclosure of the material facts outlined above as required, *inter alia,* by their obligations as the underwriters, the Plaintiff would not have bought the Bonds.

***Consistent with its undisclosed history, the Project fails to produce any net income, and HGS defaults and is declared insolvent.***

113.   On November 1, 2020, little more than a year after the Bonds were issued, the Trustee issued a Notice of Default to HGS ("Default Notice 1").

114.   Default Notice 1 stated that "[w]ithout reciting excruciating detail," HGS had "failed to make the necessary payments to enable the funding required under Section 5.04 to be made in a timely fashion."

115.   Default Notice 1 also stated that HGS had failed to achieve "Sufficient Sales" under the Loan Agreement, defined as "the realization by the Borrower of Gross

Project Revenues, less all Operating Costs, sufficient to pay Annual Debt Service on the Bonds, and (ii) a Debt Service Coverage Ratio not less than 1.30:1.00." The Trustee noted, among other things, that HGS's deposits totaled less than $20,000.

116.   Seven days later, on November 7, 2020, the Trustee issued another Notice of Default to HGS ("Default Notice 2").

117.   Default Notice 2 stated that HGS failed to provide the Trustee with a host of required financial reports and other submissions, including: monthly reports (due within 45 days after the end of each month); quarterly reports beginning on December 31, 2019; the 2019 Annual Report; the Annual Officer's Certification; and Management's Discussion and Analysis; and the Quarterly Budget.

118.   The same day, the Trustee issued another, separate Notice of Default to HGS ("Default Notice 3"). Although HGS had not provided the Trustee with the required financial data, HGS had, on October 1, 2020, submitted a Balance Sheet dated as of August 31, 2020 to the Electronic Municipal Market Access (EMMA) system. Default Notice 3 explained that after reviewing that Balance Sheet the Trustee had concluded that HGS was insolvent.

119.   On January 12, 2021, HGS finally made available 54 pages of reports showing key financial information for the Project from the time of the Bond Offering (the "January 2021 Financial Reports.").

120.   As alleged above, the January 2021 Financial Reports showed, among other things, that from July 2019 to June 2020, HGS' gross revenues were only $384,544.67, or $30,620,303.33 less than projected in the Official Statement. Instead of a projected net profit of $6,081,583, HGS actually lost $4,474,268.75. From July 2020 on, HGS's gross revenues were only $45,945, or $53,216,180 less than projected in the Official Statement. Instead of a projected net profit of $11,783,880, HGS actually lost $1,555,689.67.

121.   In short, just as it had in the years leading up to the marketing and sale of the Bonds, the Project did not merely fall short of the projections made to investors, but generated no net income at all.

31

122. As a direct and proximate result of the material misrepresentations and omissions, and the Underwriters' conduct in connection with the same, the Plaintiff has suffered damages in an amount to be proven at trial.

123. The Plaintiff hereby tenders its Bonds to the Underwriters.

## FIRST CLAIM FOR RELIEF

**(Violation of Arizona Securities Act, A.R.S. § 44-1991 – Against Aegis and MCMG)**

124. Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

125. In connection with the offer or sale of securities within or from Arizona, Defendants directly or indirectly: (i) knowingly employed a device, scheme or artifice to defraud; (ii) made untrue statements of material fact or omitted to state material facts which were necessary in order to make the statements not misleading in light of the circumstances under which they were made; and (iii) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon Plaintiff.

126. Defendants' conduct violated A.R.S. § 44-1991.

127. Defendants made, participated in or induced the sale of the Bonds within the meaning of A.R.S. § 44-2003.

128. Plaintiff did not know of the untrue statements of material fact at the time it purchased the Bonds.

129. As a result of Defendants' violation of A.R.S. § 44-1991, Plaintiff has been damaged and is, pursuant to A.R.S. § 44-2001, entitled to complete rescission and return of its investment, plus interest, attorneys' fees and costs, or, alternatively, is entitled to recover damages plus interest, attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

**(Violation of Arizona Securities Act, A.R.S. § 44-1998 – Against Aegis and MCMG)**

130. Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

131.  Defendants, within the meaning of A.R.S. § 44-1998, offered or sold a security by means of a prospectus that included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

132.  Defendants' conduct violated A.R.S. § 44-1998.

133.  Defendants made, participated in or induced the sale of the Bonds within the meaning of A.R.S. § 44-2003.

134.  Plaintiff did not know of the untrue statements of material fact at the time it purchased the Bonds.

135.  As a result of Defendants' violation of A.R.S. § 44-1998, Plaintiff has been damaged and is, pursuant to A.R.S. § 44-2001, entitled to complete rescission and return of its investment, plus interest, attorneys' fees and costs, or, alternatively, is entitled to recover damages plus interest, attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF

### (Connecticut Securities Act – Against Aegis and MCMG)

136.  Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

137.  Defendants offered and sold, and/or materially aided in the offer and sale, of the Bonds to Plaintiff in the State of Connecticut within the meaning of Conn. Gen. Stat. Ann. § 36b-29.

138.  Defendants, in connection with the offer or sale of the Bonds, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading in violation of Conn. Gen. Stat. Ann. § 36b-29.

139.  Defendants offered and sold, and/or materially aided and assisted in the offer and sale of, the Bonds to Plaintiff in violation of the Connecticut Securities Act, Conn. Gen. Stat. Ann. § 36b-29.

140.   Plaintiff did not know of the untrue statements or omissions of material fact at the time it purchased the Bonds.

141.   As a result of Defendants' violation of Conn. Gen. Stat. Ann. § 36b-29, Plaintiff has been damaged and is entitled to complete rescission and return of its investment, plus interest, attorneys' fees and costs, or, alternatively, is entitled to recover damages plus interest, attorneys' fees and costs pursuant to Conn. Gen. Stat. Ann. § 36b-29.

**FOURTH CLAIM FOR RELIEF**

**(Texas Securities Act – Against MCMG)**

142.   Plaintiff incorporates by reference the above paragraphs as though fully set forth herein.

143.   MCMG, operating out of Texas, offered and sold the Bonds to Plaintiff within the meaning of Tex. Rev. Civ. Stat. Ann. § art. 581-33.

144.   MCMG, operating out of Texas, and in connection with the offer and sale of the Bonds, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. § art. 581-33.

145.   MCMG offered and sold, and/or materially aided and assisted in the offer and sale of, the Bonds to Plaintiff in violation of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. § art. 581-33.

146.   Plaintiff did not know of the untrue statements or omissions of material fact at the time it purchased the Bonds.

147.   As a result of MCMG's violation of Tex. Rev. Civ. Stat. Ann. § art. 581-33, Plaintiff has been damaged and is entitled to entitled to complete rescission and return of

1    its investment, plus interest, attorneys' fees and costs, or, alternatively, is entitled to

2    recover damages plus interest, attorneys' fees and costs pursuant to Tex. Rev. Civ. Stat.

3    Ann. § art. 581-33.

4                              **FIFTH CLAIM FOR RELIEF**

5                        **(Common Law Fraud – Against Aegis and MCMG)**

6        148.   Plaintiff incorporates by reference the above paragraphs as though fully set

7    forth herein.

8        149.   Defendants made material misrepresentations and omissions of past and

9    present facts as more fully alleged above and knew the misrepresentations were false and

10   misleading.

11       150.   The misrepresentations and omissions, as alleged above, were made with

12   the intent to induce Plaintiff to purchase the Bonds.

13       151.   Plaintiff was not aware of the omissions and did not know that the

14   representations were false.

15       152.   Plaintiff justifiably relied upon the representations contained in the Bond

16   Documents and, as a direct and proximate result, has suffered substantial damages in an

17   amount to be proven at trial.

18                              **SIXTH CLAIM FOR RELIEF**

19                      **(Negligent Misrepresentation – Against Aegis and MCMG)**

20       153.   Plaintiff incorporates by reference the above paragraphs as though fully set

21   forth herein.

22       154.   Defendants provided information to Plaintiff without exercising reasonable

23   care to ensure such information was complete and accurate and not false or misleading,

24   as more fully set forth herein.

25       155.   Defendants knew or should have reasonably foreseen that the Offering

26   Documents would be distributed to potential purchasers of the Bonds, knew that such

27   investors would rely on the information provided in the Offering Documents when

28   deciding whether or not to purchase the Bonds, had a duty to disclose or cause to be

35

disclosed the material facts set forth above and had a duty to take reasonable action to ensure that the representations made in the Offering Documents were complete, accurate and not misleading.

156.   Defendants breached their duty to Plaintiff by negligently making the above alleged misrepresentations of, and failures to disclose, material facts.

157.   Plaintiff justifiably relied on the representations contained in the Offering Documents and, as a direct and proximate result, has suffered substantial damages in an amount to be proven at trial.

**RELIEF REQUESTED**

Plaintiff requests that the Court enter judgment in its favor and against Defendants on each of its Claims for Relief and award Plaintiff:

1.     Statutory damages or rescission;

2.     In the alternative, out-of-pocket damages;

3.     Prejudgment interest;

4.     Costs;

5.     Attorneys' fees; and

6.     Any other relief which the Court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial with respect to its Complaint.

DATED this 24th day of January, 2022.

**LAVELLE & LAVELLE, PLC**

By: /s/ Michael J. LaVelle
Michael J. LaVelle
2415 East Camelback Road, Suite 700
Phoenix, Arizona 85016

*Attorneys for Plaintiff*

36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28